IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RYAN McCLINTIC                    :          CIVIL ACTION
                                  :
          v.                      :
PENNSYLVANIA DEPARTMENT OF        :
CORRECTIONS, et al.               :          NO. 12-6642

MEMORANDUM

McLaughlin, J.                              November 12, 2013

        This action arises from the alleged failure of medical

and prison staff to accommodate the medical conditions of the

plaintiff, Ryan McClintic, a prisoner in Pennsylvania's State

Correctional Institution at Graterford ("SCI-Graterford" or "the

prison").  McClintic, who alleges that he suffers from various

mental illnesses including paruresis or "shy-bladder syndrome",

brings claims against the Pennsylvania Department of Corrections

("DOC"), several SCI-Graterford corrections officers, prison

medical staff, and other DOC and prison employees, and against

two psychiatrists.[1]  Pursuant to 42 U.S.C. § 1983, McClintic

---

        [1]  In addition to defendant psychiatrists Edgar Martinez,
M.D., and Penelope Bratton, M.D., and the Pennsylvania
Department of Corrections ("DOC"), McClintic names individual
defendants John Wetzel, Secretary of the Department of
Corrections; Michael Wenerowicz, Facility Manager at SCI-
Graterford; Charles Fix, Licensed Psychologist Manager at SCI-
Graterford; R. Grossman, Registered Nurse at SCI-Graterford; Ms.
Jagota, psychologist at SCI-Graterford; M. Moriello,
psychologist at SCI-Graterford; Donald Whitfield, psychologist
at SCI-Graterford; Mary Canino, Hearing Examiner at SCI-
Graterford; and SCI-Graterford Corrections Officers Lt. Radle,
Lt. Taylor, Lt. Boone, Ronald Quick, Officer Fina, and Officer

alleges violations of the Eighth Amendment to the United States Constitution for denial of medical care, violations of the Americans with Disabilities Act ("ADA"), violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and violations of the due process clause of the Fourteenth Amendment.

The Court considers here motions to dismiss by Edgar Martinez, M.D., and Penelope Bratton, M.D. (the "Doctors' Motion"), and by the Pennsylvania Department of Corrections and its employees (the "Commonwealth Motion").

I.   Background

The facts alleged in the complaint are assumed to be true for the purposes of evaluating the motions to dismiss; the Court also accepts as true all reasonable inferences that may be drawn from the allegations, and views those facts and inferences in the light most favorable to McClintic, the non-moving party.

A.   The Plaintiff's Medical History

McClintic alleges that he has suffered from various mental disorders since 1994, and "has been diagnosed with bipolar, depression and anxiety and has been hospitalized

Shwenk (collectively, "Commonwealth defendants").  Compl. ¶¶ 2-18.

2

several times." He suffers from "chronic tremors, [for] which he [has been] prescribed medication, chest pains, fatigue, insomnia, hyperventilation, restlessness," and has difficulty "concentrating." Compl. ¶¶ 20, 59.

McClintic's mother confirms his history of mental health issues and her observation of his deteriorating mental and physical condition after time spent in the prison's restricted housing unit. Compl. Ex. D. Two of his former cellmates also state that they observed McClintic suffer from panic attacks, confusion, weight loss, and insomnia. Id.

McClintic also alleges that he "suffers from paruresis a.k.a. (shy bladder), which is a medical/psychological condition, relating to anxiety, that makes it extremely difficult to urinate in the presence of others." This condition has compelled him "to urinate into bottles, while under his bed sheets, in order to relieve himself while being housed with cellmates," and to "hold his urine for long periods of time," leading to "chronic pain when using the bathroom." Compl. ¶¶ 20, 42, 58.

McClintic does not allege that his record contains any official medical diagnosis of paruresis. (And in fact, many of McClintic's claims flow from his underlying disagreement with the defendant doctors' refusal to provide this diagnosis.) Rather, he states that prison physician Dr. Stefanic "confirmed"

his paruresis, and gave him a "dispensary pass" directing McClintic to see Dr. Stefanic as needed for a urine sample. Compl. ¶ 41 & Ex. A.  McClintic asserts that the pass itself is evidence of his medical condition, and contends that Dr. Stefanic would not have given him such a pass if the doctor had not "diagnosed" McClintic as having paruresis.  Feb. 6 Tel. Tr. 10; Feb. 27 Tel. Tr. 10.[2]

B.   Drug Testing and Disciplinary Actions

       Prisoners at SCI-Graterford are subject to drug testing by urinalysis at random and at any time of day.  Feb. 6 Tel. Tr. 13.  Although McClintic admits to a history of drug use prior to his imprisonment, he has not produced any drug-positive urine samples during his incarceration.  Feb. 27 Tel. Tr. 10. However, on several occasions during his incarceration, McClintic has been unable to produce a urine sample within the standard two-hour window allowed by the prison.  McClintic explains that he has no difficulty producing urine samples when given sufficient time and water, and has been tested at least twice since November 2012 without incident.  Feb. 6 Tel. Tr. 13. McClintic alleges that his paruresis prevents him from producing a sample only "when they call me and they handcuff me and give me

_____

       [2]  Telephone conferences were held on the record before the Court with McClintic and defendants' counsel on February 6, 2013 ("Feb. 6 Tel. Tr."), and February 27, 2013 ("Feb. 27 Tel. Tr.").

one cup of water and two hours to go."  Feb. 27 Tel. Tr. 10.  On the three occasions when McClintic was unable to produce a timely urine sample, he was subject to disciplinary action.

  1. <u>August 2011</u>

   In August 2011, McClintic was selected for a random drug test and ordered to produce a urine sample within two hours.  McClintic alleges that he "notified" Lt. Radle that he had been fasting (including abstaining from drinking water) in observance of Ramadan, according to his religious obligations, and that he suffered from "shy bladder"; accordingly, McClintic requested an extra hour in which to produce a sample.  Compl. ¶ 24.  Lt. Radle denied his request.  Because McClintic was unable to urinate within the allotted two hours, he received a misconduct charge for "refusing to obey an order."  As punishment, McClintic was moved to the Restricted Housing Unit ("RHU") for ninety days, and was unable to receive contact visits for a period of six months.  While confined to the RHU, McClintic lost both his low-security custody level and the prison job that had allowed him to work "outside the wall." Compl. ¶¶ 22-25.

2.   May 17, 2012

On May 17, 2012, McClintic was again selected for random drug testing, which was conducted by Corrections Officers Fina and Quick.  Again, he was unable to produce a urine sample within two hours and, as a result, received a second misconduct charge.  Before the disciplinary hearing on this second infraction, McClintic requested that Hearing Examiner Mary Canino allow him to call a psychiatry staff member "as a witness to [his] paruresis."  Ms. Canino denied his request.  McClintic was found guilty of this second infraction and was moved to restricted housing for ninety days; his contact visits were suspended for one year.  Compl. ¶¶ 33-35 & Ex. C.[3]

3.   July 23, 2012

On July 23, 2012, while again observing the Ramadan fast (and presumably while incarcerated in RHU for his second misconduct), McClintic was selected for a random drug test and ordered to produce a urine sample in two hours, but was unable to do so.  Compl. ¶ 43.  Before this third test, McClintic presented a "Dispensary Pass" to Officers Quick and Fina. McClintic alleges that, on July 9, 2012, "Dr. Stefanic confirmed [his] paruresis and issued him a 'Dispensary Pass' in the event

_____

[3]   McClintic alleges that he "appealed his misconduct complaining of paruresis and other Due Process claims but was denied relief at every level."  Compl. ¶ 35.

[McClintic] is asked to produce a urine he could be catheterized." Compl. ¶ 41. The pass reads: "as needed see Dr. Stefanic for urine sample; End Date: indefinite." Compl. Ex. A.

In addition to producing the Dispensary Pass, McClintic explained to Lt. Boone, Quick and Fina that "he was fasting [for Ramadan] and had no fluids in his system and that he suffered from paruresis." Compl. ¶ 43. Lt. Taylor then confiscated the dispensary pass under the supervision of Lt. Boone. Feb. 27 Tel. Tr. 16. Specifically, McClintic claims that Lt. Boone asked why McClintic had a dispensary pass and the plaintiff explained that a doctor had given it to him for paruresis, or "shy bladder syndrome," which made it difficult for the plaintiff to urinate in the presence of others. Id. Lt. Boone replied with words to the effect of "that's not a condition, you can't use this [dispensary pass]." Id.

According to McClintic, the officers present then went into another room to "make a call"; when they returned, Corrections Officer Fina said that Dr. Stefanic "lost that pass." Id. As a result of his failure to produce a timely urine sample McClintic received his third misconduct charge for refusing to obey an order. Compl. ¶ 44. At his disciplinary hearing on July 31, 2012, McClintic requested that Dr. Stefanic be called as a witness to his paruresis. Hearing Examiner

Canino denied the request, and returned McClintic to the RHU for ninety days.  Compl. ¶ 45.[4]

C.   Medical Treatment

McClintic "became mentally [and] emotionally unstable" while housed in the RHU after his first disciplinary hearing in August 2011.  While in the RHU, McClintic requested to see a psychologist several times, to no avail.  After returning to the general prison population in November 2011, McClintic told his Unit Manager, Mr. Baker, that "it was an emergency" and that he needed to see a psychiatrist. Compl. ¶¶ 26-27.

In December 2011, McClintic was seen by psychologist Donald Whitfield, from whom he requested psychiatric care and "accommodations" for his anxiety and paruresis, in the form of single-cell housing and an alternative form of drug testing. Whitfield told McClintic he could not "do anything about that" and referred McClintic to the Psychiatry Department. Compl. ¶ 27.

On December 9, 2011, McClintic met with psychiatrist Dr. Martinez.  McClintic complained of regular panic attacks, insomnia and tremors, and requested medication, single-cell

---

[4]   McClintic notes that, with the exception of the three incidents described above, he has not received any misconduct charges since his arrival at SCI-Graterford in 2009.  Compl. ¶ 46.

housing, and other accommodations for his anxiety and paruresis. McClintic's request for single-cell housing was denied, but he evidently received medication, because, on January 25, 2012, he complained to psychiatrist Dr. Bratton that his anti-depressant medication, Celexa, "wasn't helping". Dr. Bratton discontinued the Celexa, and told McClintic that she would talk to the Security Captain about drug testing. Compl. ¶¶ 28-29.

For a period of six months between February 2012 and August 2012, McClintic made numerous requests to see a psychiatrist, without success. Compl. ¶ 30 & Ex. B. McClintic claims that his mental health deteriorated during this period, and "he experienced severe anxiety attacks accompanied by fatigue, hypertension, tremors, insomnia, chest pain and hallucinations." Compl. ¶ 31.

At least twice during that six month period McClintic was treated by non-psychiatric medical staff, including Dr. McDonald and a registered nurse named Paula. McClintic claims that on both occasions medical staff "put in a 'referral' to psychiatry after it was determined that [he] was suffering from 'anxiety attacks'." Compl. ¶ 32.

On June 6, 2012, during his second period of incarceration in the RHU, McClintic went on a "hunger strike" in the hope of being seen by a psychiatrist. Approximately six days later, Ms. Jagota, a psychologist, met with McClintic and

promised to "make arrangements to accommodate his paruresis and start medications for his mental illness."  Compl. ¶¶ 36-37. McClintic also filed several grievances requesting psychiatric care and "accommodation in accordance with D.O.C. Policy DC-ADM 006."  Compl. ¶ 8 & Ex. B.  RNS Grossman responded to McClintic's June 8, 2012 grievance that paruresis is "not a medical issue" and if he could not produce a urine sample within the time allotted by SCI-Graterford and the DOC, he would have to "face the consequences."  Compl. Ex. B.

On July 9, 2012, McClintic was treated by Dr. Stefanic as described above, and was issued the dispensary pass that was later confiscated.  McClintic was also treated by Dr. Stefanic on July 30, 2012, for an unrelated medical issue.  He was treated by Dr. Martinez on August 6, 2012, but this time Dr. Martinez and defendant Moriello "made it very clear that no accommodations [would] be made."  Compl. ¶ 47.

McClintic had at least one additional psychiatric appointment between October 21, 2012, when he returned to the general prison population, and November 29, 2012, when he filed the instant action.  He is currently taking 1000 mg. of Naprosyn (an NSAID) daily, and has been prescribed Cardura to help him pass urine more frequently.  Pl.'s Opp'n to Commw. Mot. 14.  He also sees prison psychiatric staff on a regular basis for treatment of his anxiety.  Feb. 6 Tel. Tr. 9-10.

10

D.    The Plaintiff's Claims[5]

McClintic brings the following claims against the defendants in both their official and individual capacities:

(1)    Eighth Amendment:  McClintic claims that Dr. Martinez, Dr. Bratton, SCI-Graterford Facility Manager Wenerowicz, SCI-Graterford Psychologist Manager Fix, SCI-Graterford psychologist Jagota, SCI-Graterford psychologist Whitfield, and Pennsylvania DOC Secretary Wetzel were deliberately indifferent to McClintic's medical needs in violation of the Eighth Amendment. Compl. ¶ 54.

(2)    ADA:  McClintic claims that "the actions and policies of the Pennsylvania DOC," and the individual actions of Dr. Bratton, Dr. Martinez, Nurse Grossman, psychologists Fix, Jagota, Moriello, and Whitfield, and Corrections Officers Radle, Boone, Taylor, Quick, Fina and Shwenk, violated the ADA in

---

[5]    McClintic requests a declaratory judgment that the defendants have violated his rights under the Eighth and Fourteenth Amendments, the ADA, and RLUIPA.  He also seeks monetary compensation, and injunctions requiring the defendants to arrange for McClintic to be evaluated by an outside mental health care professional, to provide him with single-cell housing and an alternative means of drug testing, to make other accommodations for his disabilities, and to remove the misconduct charges from his record and return him to low-security custody status.  Compl. at 11, ¶¶ A-E.  The complaint does not specify for which claims each type of relief is sought.

failing to accommodate McClintic's alleged disabilities.  Compl. ¶¶ 53, 55.

    (3)  <u>Due Process</u>:  McClintic claims that Hearing Examiner Mary Canino violated his due process rights under the Fourteenth Amendment by refusing to allow him to call witnesses at his disciplinary hearings.  Compl. ¶ 57.

    (4)  <u>RLUIPA</u>:  McClintic contends that Corrections Officers Radle, Taylor, Quick, and Fina violated RLUIPA because they were made aware that McClintic was fasting for Ramadan and unable to drink water in August 2011, and on July 23, 2012, but refused to allow McClintic to undergo alternative means of drug-testing, and punished him when he could not provide a urine sample.  Compl. ¶ 56.

    E.    <u>The Motions to Dismiss</u>

        1.  <u>Dr. Bratton & Dr. Martinez</u>

        Dr. Bratton and Dr. Martinez move to dismiss all claims against them on the grounds that:  (1) McClintic has failed to state a claim against them personally for violations of the Fourteenth Amendment and RLUIPA;[6] (2) McClintic has failed to exhaust his administrative remedies as to his ADA and Eighth

───────────────

    [6]    McClintic agrees that he does not assert due process or RLUIPA claims against Dr. Martinez and Dr. Bratton.  Pl.'s Opp'n to Drs.' Mot. 4.

Amendment claims; (3) McClintic's claim under the ADA fails as a matter of law because the ADA does not provide for individual liability; (4) McClintic has failed to allege facts sufficient to support a claim for deliberate indifference under the Eighth Amendment; and (5) McClintic lacks standing for his claim for injunctive relief against Dr. Bratton and Dr. Martinez because the doctors cannot provide him with the relief he seeks.[7]

### 2.   The Commonwealth Defendants

The Commonwealth defendants move to dismiss all claims against them on the following grounds:  (1) The Eleventh Amendment bars McClintic's claims against all the Commonwealth defendants in their official capacities; (2) McClintic's medical indifference claims against Wetzel, Wenerowicz, Fix, Radle, Taylor, Boone, Quick, Fina, Shwenk, and Canino in their individual capacities fail because these defendants had no personal involvement in McClintic's medical treatment;[8] (3) McClintic's allegations fail to state a claim for inadequate medical treatment; (4) McClintic's allegations fail to state a due process claim because his confinement in the RHU does not

_____

[7]   Because the Court finds that McClintic's claims against Dr. Bratton and Dr. Martinez fail on other grounds, the Court will not address the doctors' standing argument.

[8]   In his response to the Commonwealth defendants' motion, McClintic withdraws his claims against Wetzel and Shwenk.  Pl.'s Opp'n to Commw. Mot. 10.

implicate a protected liberty interest; (5) McClintic's ADA
claims against the Commonwealth defendants in their individual
capacities fail because the ADA does not provide for individual
liability; (6) McClintic has failed to establish a disability
under the ADA; (7) RLUIPA does not authorize money damages
against individuals; and (8) McClintic's allegations are
insufficient to state a claim for a violation of RLUIPA.


II.   Analysis

         To survive a motion to dismiss, a plaintiff's
"[f]actual allegations must be enough to raise a right to relief
above the speculative level . . . ." Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  In
assessing a complaint, the Court must accept as true all factual
allegations, and view those facts and draw any reasonable
inferences therefrom in favor of the non-moving party.[9] Revell
v. Port Auth. of New York, 598 F.3d 128, 134 (3d Cir. 2010).
The Court is not required, however, to accept as true a
plaintiff's "unsupported conclusions and unwarranted

---

[9]   In addition to the facts alleged in the complaint, the
Court will take into account any other factual allegations or
documents that McClintic has introduced into the record by way
of his briefing on the motions to dismiss, his motion for
preliminary injunction, and his motion for appointment of
counsel.  The Court will also consider any factual assertions by
McClintic during the telephone conferences held on the record
before the Court with McClintic and defendants' counsel on
February 6, 2013, and February 27, 2013.

inferences," Doug Grant, Inc. v. Great Bay Casino Corp., 232
F.3d 173, 184 (3d Cir. 2000) (citations and quotations omitted),
or credit a plaintiff's "bald assertions" or "legal conclusions"
unsupported by factual allegations.  Morse v. Lower Merion Sch.
Dist., 132 F.3d 902, 906 (3d Cir. 1997) (citations and
quotations omitted).

     A.   Threshold Issues With Respect to Liability

     Both the Commonwealth defendants and the doctor
defendants argue that McClintic's claims are barred, in whole or
in part, because the law does not allow or does not provide for
certain types of liability or damages.

     First, the Commonwealth defendants argue that state
sovereign immunity bars McClintic's claims against the DOC, and
his claims against the individual DOC employees in their
official capacities under 42 U.S.C. § 1983.  "State governments
and their subsidiary units are immune from suit in federal court
under the Eleventh Amendment . . . ." Betts v. New Castle Youth
Dev. Ctr., 621 F.3d 249, 253-54 (3d Cir. 2010).[10]  As part of the

----

[10]   The Eleventh Amendment provides that "[t]he Judicial
power of the United States shall not be construed to extend to
any suit in law or equity, commenced or prosecuted against one
of the United States by Citizens of another State, or by
Citizens or Subjects of any Foreign State."  U.S. Const. amend.
XI.  The Eleventh Amendment has long been interpreted to
prohibit suits brought by a citizen against his own state, as

executive department of the Commonwealth of Pennsylvania, the
DOC shares in the state's Eleventh Amendment immunity.  Lavia,
224 F.3d at 195.  State sovereign immunity "extends beyond the
literal text of the Eleventh Amendment" to include a state's
immunity from liability, as well as from suit in federal court.
Lombardo v. Pa. Dep't Pub. Welfare, 540 F.3d 190, 195 (3d Cir.
2008).  That sovereign immunity can only be abrogated by
Congress or waived by state consent, which consent Pennsylvania
has expressly withheld.  42 Pa. C.S. § 8521(b).  McClintic's
claim against the DOC will therefore be dismissed.

        Individual state employees sued in their official
capacities are "also entitled to Eleventh Amendment immunity
because 'official-capacity suits generally represent only
another way of pleading an action' against the state."  Betts,
621 F.3d at 253-54 (quoting Hafer v. Melo, 502 U.S. 21, 25
(1991)).  Therefore any claim for money damages brought against
the individual defendants in their official capacities will be
dismissed.

        Individual state officials may, however, be subject to
federal suit in their official capacities where the plaintiff
seeks only prospective, injunctive relief from an ongoing
violation of federal law.  Koslow v. Commw. of Pa., 302 F.3d

---

well as suits by citizens of other states.  Lavia v. Pa. Dep't
of Corr., 224 F.3d 190, 195 (3d Cir. 2000).

161, 168 (3d Cir. 2002) (discussing <u>Ex parte Young</u>, 209 U.S. 128, 160 (1908)).  State officials also may be subject to suit in their personal capacities, for both money damages and injunctive relief.

Second, all the defendants argue that the ADA claim brought against the defendants in their personal capacities is not cognizable under the ADA.  The Court of Appeals for the Third Circuit has stated in dicta that individual liability is not available for discrimination claims brought under Title I or Title II of the ADA.  <u>See</u> <u>Koslow</u>, 302 F.3d at 178 ("there appears to be no individual liability for damages under Title I of the ADA"); <u>Emerson v. Thiel College</u>, 296 F.3d 184, 189 (3d Cir. 2002) (suggesting in dicta that "individuals are not liable under Titles I and II of the ADA") (citing <u>Garcia v. S.U.N.Y. Health Sciences Ctr.</u>, 280 F.3d 98, 107 (2d Cir. 2001) (holding Title II does not allow suits against individuals)).[11] Therefore, McClintic's ADA claim will be dismissed as to all defendants to the extent that he brings his claim against them in their personal capacities, and to the extent that he seeks money damages for his official-capacity claim.

_____

[11]  <u>Cf.</u> <u>Brown v. DeParlos</u>, 492 F. App'x 211, 215 n.2 (3d Cir. July 2, 2012) ("The District Court dismissed [plaintiff's] ADA claim because it determined that individuals are not liable under Title II of the ADA.  This Court has yet to address individual liability under Title II of the ADA, and we decline to do so now . . . .").

To the extent McClintic seeks money damages for his RLUIPA claim against certain Commonwealth defendants, that claim must be dismissed.  See Sossamon v. Texas, 131 S.Ct. 1651, 1660, 1663 (2011) (holding that states, in accepting federal funding, do not waive their sovereign immunity to private suits for money damages under RLUIPA).  Moreover, RLUIPA does not permit actions against state officials in their individual, personal capacities.  Sharp v. Johnson, 669 F.3d 144, 154 (3d Cir. 2012). McClintic's RLUIPA claim will therefore be dismissed as to all defendants to the extent that he brings his claim against them in their personal capacities, and to the extent that he seeks money damages for his official-capacity claim.

In summary, the defendants are immune to suit as to all McClintic's claims asserted against them in their official capacities, to the extent that he seeks monetary damages, declaratory judgment, or other forms of relief that serve to compensate him for or correct alleged past wrongs.  And no defendant is subject to suit in his or her personal capacity for McClintic's claims asserting violations of Title II of the ADA, or of RLUIPA.

However, the defendants are not immune to suit in their official capacities to the extent McClintic seeks prospective, injunctive relief for alleged ongoing violations of

his federal rights.[12]  Finally, all the defendants are subject to suit in their personal capacities as to the claims for medical indifference and due process violations, where McClintic has adequately alleged a defendant's personal involvement in or actual knowledge of a violation of his rights.

### B.   Exhaustion of Remedies

Dr. Bratton and Dr. Martinez argue that McClintic has failed to exhaust his administrative remedies with regard to his Eighth Amendment and ADA claims.  The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust all available administrative remedies before bringing any action under Section 1983.  42 U.S.C. § 1997e(a).  Prisoners are therefore required to pursue any remedies available to them through the applicable prison grievance system before filing a claim.  Spruill v. Gillis, 372 F.3d 218, 231-232 (3d Cir. 2004).

DC-ADM 804 is the Pennsylvania Department of Corrections' consolidated inmate grievance review system, which outlines the procedure by which prisoners must file formal

---

[12]  McClintic's request for relief appears to seek "prospective injunctive relief" for alleged ongoing violations of the Eighth Amendment and the ADA in the form of evaluation by an outside medical professional, single-cell housing, and alternative drug testing.  As to McClintic's RLUIPA claim, a liberal reading of the complaint permits the Court to infer that he seeks prospective injunctive relief in the form of alternative drug testing during Ramadan.

written grievances and appeal those grievances through final review by the Secretary's Office of Inmate Grievances and Appeals ("SOIGA").  Drs.' Mot. 21-24 & Ex. A.  McClintic has submitted evidence of his initial informal Inmate Request to Staff Member (DCM-135-A) forms, and his appeals from those requests to the Facility Manager, and the Chief Grievance Coordinator.  Compl. Ex. B.  Although McClintic's appeals were submitted on incorrect forms, he states clearly in each that his request is an appeal from a grievance or adverse disciplinary decision, and, in several instances, that the appropriate appeal forms were not made available to him.  Id.  McClintic has also submitted a copy of SOIGA's "Final Appeal Decision" regarding McClintic's complaints that he had not received adequate mental health care and that he required single-cell housing and alternative drug testing to accommodate his paruresis.  Pl.'s Opp'n to Drs.' Mot. Ex. A (SOIGA Final Appeal Decision, November 7, 2012).  No further relief is available to McClintic through the prison grievance system; therefore he has exhausted his administrative remedies as to his ADA and Eighth Amendment claims.[13]

---

[13]   Only Dr. Bratton and Dr. Martinez have raised the affirmative defense of exhaustion, and only as to McClintic's medical indifference and ADA claims.

The Court notes, however, that the grievances and appeals in the record relate only to McClintic's complaints about mental health care, single-cell housing, and alternative drug testing to accommodate his paruresis.  Pl.'s Opp'n to Drs.' Mot. Ex. A.  No grievance or request form in the record contains a complaint that the defendants' drug-testing procedure adversely impacted McClintic's ability to fast during Ramadan.

C.    Eighth Amendment Claim for Medical Indifference

McClintic claims that Dr. Martinez, Dr. Bratton, SCI-Graterford Facility Manager Wenerowicz, SCI-Graterford Psychologist Manager Fix, SCI-Graterford psychologist Jagota, and SCI-Graterford psychologist Whitfield were deliberately indifferent to McClintic's medical needs in violation of the Eighth Amendment.  Compl. ¶ 54.[14]

"To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution . . . committed by a person acting under the color of state law."  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 580-81 (3d Cir. 2003).  In accordance with the Eighth Amendment's prohibition against cruel and unusual punishment, the government is obliged "to provide medical care for those whom it is punishing by incarceration."  Estelle v. Gamble, 429

---

[14]   As noted above, McClintic has withdrawn all claims against Pennsylvania DOC Secretary Wetzel.

U.S. 97, 103 (1976).  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment."  Id. at 104 (citation omitted).  "[W]hether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. . . . deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."  Id. at 104-05 (citations omitted).

But "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Id. at 106.  Therefore, to state a cognizable claim, a prisoner must allege: "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale, 318 F.3d at 582.

A medical need is "serious" if "it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted).  "The seriousness of an inmate's medical

need may also be determined by reference to the effect of denying the particular treatment." Id.

The "deliberate indifference" a plaintiff must allege lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other" and is frequently equated with recklessness as that term is defined in criminal law. Farmer v. Brennan, 511 U.S. 825, 836-37 (1994). This standard "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients." Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979). Where a prisoner has received medical care and only the adequacy of the treatment is disputed, courts are often reluctant to second guess professional medical judgment. See id.

Courts have held that paruresis, by itself, may in some instances constitute a "serious" medical need. See Roundtree v. Walton, No. 12-1166, 2013 WL 1840377, at *3 (S.D. Ill. May 1, 2013).[15] But see Brammer v. Northrop, No. 06-6520, 2010 WL 681296, at *3 (W.D.N.Y. Feb.24, 2010) (inmate's shy bladder syndrome was not objectively sufficiently serious and

---

[15] See also Jenkins v. Yates, No. 11-0805, 2012 WL 6088289, at *4 (E.D. Cal. Dec. 6, 2012); Hunt v. Houston, No. 11-3086, 2011 WL 3897602, at *3 (D. Neb. Sept. 6, 2011); Chapman v. Raemisch, No. 05-1254, 2009 WL 425813, at *6 (E.D. Wisc. Feb. 20, 2009).

only arose when he was asked to provide a urine sample).
McClintic concedes that he is able to produce urine when given
sufficient time and water, and other than "chronic pain when
going to the bathroom," he has not identified any physically
detrimental effect of defendants' refusal to provide him with
his requested accommodations.  For the purpose of evaluating the
motions to dismiss, however, the Court will assume that
McClintic has alleged a serious medical need.

      Notwithstanding that assumption, he has failed to
allege any acts by medical staff or prison officials that rise
to the level of deliberate indifference.  Courts consistently
have held that "mere disagreement as to the proper medical
treatment" or allegations of medical malpractice do not support
an Eighth Amendment claim.  Lanzaro, 834 F.2d at 346.  The
defendant doctors' "failure" to provide McClintic with his
requested official diagnosis of paruresis (on which diagnosis
many of his other claims succeed or fail) is not deliberate
indifference.[16]  McClintic has also alleged that he was treated

---

[16]   See Sheehy v. Palmateer, 68 F. App'x 77, 78-79 (9th Cir.
June 18, 2003) (doctor's disagreement with plaintiff about his
medical condition of paruresis was not deliberate indifference);
Arnett v. Shojaie, No. 10-6814, 2011 WL 5434417, at *12 (C.D.
Cal. Nov. 8, 2011) (refusal to prescribe alternative drug
testing or single-cell housing for plaintiff's purported shy
bladder syndrome was not deliberate indifference); Roundtree,
2013 WL 1840377, at *3-4 (prison officials' refusal to provide
alternative drug testing was not deliberate indifference where
prisoner's paruresis was self-reported).  But see Hunt, 2011 WL

by prison medical staff at least ten times between November 2011 and November 2012, and at six of these appointments he met with either a psychiatrist or psychologist.  He has also alleged that prison doctors, including defendants Bratton and Martinez, have prescribed several medications to treat his anxiety, depression, pain and urinary difficulties.  McClintic protests that "he merely mentioned the times when he did receive treatment in order to establish a pre-existing history of mental health [issues]."  Pl.'s Opp'n to Commw. Mot. 15.  Regardless of his intentions, McClintic has described a level of medical care that cannot support a claim of deliberate indifference.

McClintic has also alleged deliberate indifference on the part of the prison and DOC officials who failed to respond to or agree with his complaints regarding his medical treatment.  A prison official "cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  In addition, an individual defendant in a civil rights action "must have

3897602, at *3 (deliberate indifference adequately alleged when prison physicians failed to recognize and treat plaintiff's shy bladder syndrome, where prisoner suffered from "PTSD, hypertension, and goes for long periods of time without drinking any fluids or urinating").

personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).[17]

The Third Circuit has held that "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." Id.

Finally, McClintic alleges deliberate indifference on the part of the corrections officers who confiscated the dispensary pass provided to the plaintiff by Dr. Stefanic. A non-medical defendant's refusal to follow a medical directive can, in some cases, constitute deliberate indifference. Here, however, the language of the dispensary pass directing that "as needed", McClintic should "see Dr. Stefanic for [a] urine sample", is not sufficient to alert the corrections officers to a serious risk of harm to McClintic's health if he were required

---

[17]   Personal involvement "can be shown through allegations of personal direction or of actual knowledge [of] and acquiescence" to a subordinate's violation of a plaintiff's constitutional rights.  Rode, 845 F.2d at 1207.

to provide a urine sample under standard drug-testing conditions.

Accordingly, McClintic's Eighth Amendment claim will be dismissed as to all defendants.

D.   ADA Claim

McClintic claims that "the actions and policies of the Pennsylvania DOC," and the individual actions of Dr. Bratton, Dr. Martinez, Nurse Grossman, psychologists Fix, Jagota, Moriello, and Whitfield, and Corrections Officers Radle, Boone, Taylor, Quick, Fina and Shwenk, violated the ADA in failing to accommodate McClintic's alleged disabilities.  Compl. ¶¶ 53, 55.[18]

To establish a claim for relief under Title II of the ADA, an inmate must allege that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied benefits of some public entity's services, programs, or activities, or was subject to discrimination by a public entity; and (3) such exclusion, denial of benefits, or discrimination was "by reason of" his disability.  See 42 U.S.C. § 12132.

---

[18]   As noted above, McClintic has withdrawn his claims against Corrections Officer Shwenk, and his ADA claim against the DOC will be dismissed as barred by sovereign immunity.

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities . . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  Not every physical or mental impairment or medical condition qualifies as a disability for purposes of the ADA.  The impairment or impairments in question must also "substantially limit[] one or more major life activities."  42 U.S.C. § 12102(1)(A).  "Major life activities" include, but are not limited to: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A). Major life activities also include the operation of major bodily functions such as: "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  42 U.S.C. § 12102(2)(B).

Courts are divided as to whether a medical diagnosis of paruresis may support a plaintiff's claim under the ADA.  See Carey v. Arizona Dep't Corr., No. 09-8020, 2010 WL 148211, at *3 (D. Ariz. Jan. 12, 2010) (liberally construed, prisoner's alleged official medical diagnosis of paruresis supported an ADA claim).  But see Kinneary v. City of New York, 601 F.3d 151, 157

n.3 (2d Cir. 2010) (in the context of an employment discrimination suit, suggesting in dicta that shy bladder syndrome may not qualify as a disability under the ADA).

Although McClintic has alleged that his bladder function (as well as, on occasion, his ability to sleep and concentrate) is occasionally impaired or limited in relation to the general population, he has not, in fact, been diagnosed with paruresis by any medical professional.  Pl.'s Opp'n to Drs.' Mot. Ex. A (SOIGA Final Appeal Decision) ("With regard to a self-diagnosed 'shy bladder', you have never been diagnosed with such a condition by medical professionals.  As a result, there is no rationale for special accommodations or security arrangements to be made.").[19]  For the purpose of considering the motions to dismiss, however, the Court will assume that McClintic has alleged a disability under the ADA.

---

[19]   Pursuant to the general procedures outlined in DC-ADM 006 for making reasonable accommodations for inmates with disabilities, the prison's "health care department, through qualified personnel or specialists, and in conjunction with the affected inmate, shall make the diagnosis of a qualified disability, unless previously diagnosed, and shall determine the level of accommodation needed and provide the appropriate medical treatment, as required by the condition."  Pl.'s Opp'n to Drs.' Mot. Ex. B.  The allegations in the complaint and record documents introduced by McClintic support the inference that he has been diagnosed with and is being treated for anxiety, but not that he has been diagnosed with a "qualified disability" that would entitle him to additional accommodation.

McClintic nevertheless has failed to identify any discrimination he has suffered, or program, service, activity or benefit from which he has been excluded or which he has been denied "because of" his alleged disability.  The treatment (or lack thereof) of a prisoner's medical condition typically does not provide a basis upon which to impose liability under the ADA.  See Bryant v. Madigan, 84 F. 3d 246, 249 (7th Cir. 1996) (holding that "the [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.  No discrimination is alleged; [plaintiff] was not treated worse because he was disabled.  His complaint is that he was not given special accommodation. . . . He is complaining about incompetent treatment of his [disability].  The ADA does not create a remedy for medical malpractice."); see also Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir. 2005) (concluding that a lawsuit under the ADA "cannot be based on medical treatment decisions"); Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005) (medical decisions do not ordinarily fall within the scope of the ADA).[20]

---

[20]  The Third Circuit has not yet addressed this issue in a published opinion; however, similar conclusions——that the ADA is not implicated where a prisoner alleges he received inadequate medical care *for* an alleged disability, but not that such care was *by reason of* the alleged disability——have been reached in Pierce v. Pitkins, 520 F. App'x 64, 67 (3d Cir. Apr. 8, 2013); DeParlos, 492 F. App'x at 215; Mutschler v. SCI Albion CHCA

This Court is persuaded that the defendants' refusal
to diagnose McClintic with a "qualified disability" under the
prison guidelines——and by extension, their refusal to
"accommodate" his condition with special housing or drug testing
procedures——does not state a claim for a violation of the ADA.[21]
McClintic's ADA claim will therefore be dismissed as to all
defendants.


    E.   <u>Due Process Claim</u>

McClintic claims that Hearing Examiner Mary Canino
violated his due process rights under the Fourteenth Amendment
by refusing to allow him to call witnesses at his disciplinary
hearings.  Compl. ¶ 57.

A prisoner facing the deprivation of a legally
cognizable state-created liberty interest or constitutional
right has a due process right to certain procedural protections
in disciplinary proceedings, including the opportunity to call

---

<u>Health Care</u>, 445 F. App'x 617, 621 (3d Cir. Sept. 27, 2011);
<u>Brown v. Pa. Dep't Corr.</u>, 290 F. App'x 463, 467 (3d Cir. Aug. 4,
2008) (ignoring a prisoner's alleged disability does not
establish discriminatory animus); and <u>Iseley v. Beard</u>, 200 F.
App'x 137, 142 (3d Cir. Oct. 3, 2006).

[21]  Even where a qualified disability has been diagnosed by
prison medical staff, "[i]n determining the type of auxiliary
aid and/or service necessary consideration should be given to
the requests of the inmate with the disability, *but the inmate's
request is not determinative.*"  Pl.'s Opp'n to Drs.' Mot., Ex. B
(DC-ADM 006)(emphasis in original).

witnesses and present documentary evidence.  Wolff v. McDonnell,
418 U.S. 539, 566-67 (1974).  "For a prisoner, such a
deprivation occurs when the prison 'imposes atypical and
significant hardship on the inmate in relation to the ordinary
incidents of prison life.'"  Mitchell v. Horn, 318 F.3d 523, 531
(3d Cir. 2003) (quoting Sandin v. Conner, 515 U.S. 472, 484
(1995)).

        In deciding whether a protected liberty interest
exists under Sandin, the Third Circuit considers "the duration
of the disciplinary confinement and the conditions of that
confinement in relation to other prison conditions."  Mitchell,
318 F.3d at 532 (citing Shoats v. Horn, 213 F.3d 140, 144 (3d
Cir. 2000)).  The Third Circuit has held that a limited period
of placement in disciplinary or administrative custody[22] is not
generally sufficient, by itself, to establish an atypical and
significant hardship under Sandin.  See, e.g., Smith v.
Mensinger, 293 F.3d 641, 654 (3d Cir. 2002) (seven months'
disciplinary confinement "does not, on its own, violate a
protected liberty interest"); Torres v. Fauver, 292 F.3d 141,
151 (3d Cir. 2002) (disciplinary detention for fifteen days and

---

        [22]  Disciplinary custody is the maximum restrictive status
of confinement for inmates in the Pennsylvania prison system,
whereas administrative custody is a non-disciplinary confinement
status which provides closer supervision, control, and
protection than that typically provided in the general prison
population.  See Mitchell, 318 F.3d at 532 n.5.

administrative segregation for 120 days was not atypical treatment in New Jersey prisons); Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997) (fifteen months in administrative custody was not an atypical and significant hardship).  Compare Shoats, 213 F.3d at 144 (eight years in administrative confinement with no prospect of immediate release clearly implicated a protected liberty interest).  McClintic's disciplinary transfers to the RHU for 90-day periods do not, by themselves, constitute an atypical or significant hardship in relation to standard Pennsylvania prison conditions. [23]

---

[23] McClintic has alleged that, while in the RHU, he lost most of his previous privileges, including "family communication, recreation, commissary, t.v., radio and educational/vocational programs", that he was confined 23 hours a day to a 50-foot square cell, was not permitted much of his personal property, was "subjected to constant loud noises such as banging and screaming" by other inmates, and was forced to share "the yard" with inmates who threw feces and urine at each other.  Compl. ¶¶ 60-62.  While undoubtedly unpleasant, the majority of these circumstances appear to be typical of conditions in restricted custody.  See Griffin, 112 F.3d at 706-707.

The suspension of McClintic's contact visits also does not create a protected liberty interest.  See, e.g., Overton v. Bazzetta, 539 U.S. 126, 137 (2003) (holding that a two-year restriction on certain types of visitation is "not a dramatic departure from accepted standards for conditions of confinement" and does not violate the substantive due process clause of the Fourteenth Amendment).  See also Henry v. Dep't of Corr., 131 F. App'x 847, 848-50 (3d Cir. May 19, 2005) (holding that a permanent ban on prisoner's contact visitation did not implicate a legally cognizable liberty interest or violate the Eighth Amendment).

Accordingly, McClintic's due process claim against Ms. Canino will be dismissed in its entirety.

F.   RLUIPA Claim

McClintic has brought a claim against Lt. Radle, Lt. Taylor, Corrections Officer Ronald Quick, and Corrections Officer Fina under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc, et seq., based on their refusals in August 2011 and July 2012 to give him extra time or use an alternative method to collect a urine sample for drug testing, after McClintic had informed them that he was fasting in observance of Ramadan.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates that imposition of the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that . . . interest."  42 U.S.C. § 2000cc-1(a).

If a plaintiff produces prima facie evidence to support a claim alleging a RLUIPA violation "the government shall bear the burden of persuasion on any element of the claim, except . . . the burden of persuasion on whether the . . .

practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b). Therefore, "[a] plaintiff-inmate bears the burden to show that a prison institution's policy or official practice has substantially burdened the practice of that inmate's religion." Washington v. Klem, 497 F.3d 272, 277-278 (3d Cir. 2007).

The Third Circuit has held that, "[f]or the purposes of RLUIPA, a substantial burden exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." Id. at 280 (capitalization in original).

The Commonwealth defendants do not appear to dispute that McClintic is a practicing Muslim with a sincere belief in his religion, or that fasting for Ramadan is an important aspect of the Islamic faith.[24] They argue only that McClintic's claim

---

[24] "In addition to not differentiating between bona fide faiths, RLUIPA does not permit a court to determine whether the belief or practice in question is compelled by, or central to, a system of religious belief. . . . [but] does permit inquiry into the sincerity of a prisoner's religious beliefs." Klem, 497 F.3d at 277 (citations and quotations omitted).

should be dismissed because the complaint does not contain any allegations "that the defendants ordered or even suggested to plaintiff that he break his fast and violate his beliefs in order to produce a urine sample.  [The] [p]laintiff did not allege that submitting for a urine sample constituted a substantial burden on his religious exercise because he was unable to practice the tenets of his religion.  The DOC's urine sample policy did not prohibit plaintiff from adhering to his faith."  Commw. Mot. 22.[25]

McClintic does not allege that any defendant expressly ordered him to break his fast; nor does he employ the statutory "substantial burden" language in his complaint.  He contends, however, that the defendants placed a substantial burden on his religious practice because "[h]is only choice could have been to drink water and break his religious obligations or continue to fast and face disciplinary sanctions" when he failed to produce a urine sample within the required time-period.  Pl.'s Opp'n to Commw. Mot. 24.  McClintic has alleged that fasting in observance of Ramadan is a "religious

---

[25]   The Court agrees that a drug testing policy requiring a prisoner to produce a urine sample within two hours does not, in and of itself, burden McClintic's ability to fast. The policy does not require a prisoner to drink water, and in many cases would not be problematic even when a prisoner is fasting for Ramadan (for example, where testing was conducted after sundown, or only shortly after fasting began at sunup).

obligation" and "a central tenet of his faith," and that "at all times Defendants were aware that [he] was observing his religious fast and could've tested him in the evening (when [he] had broken his fast) or provide[d] him with alternative forms of testing, at a de minim[i]s cost to the institution."  Compl. ¶¶ 22, 24, 43, 56; Pl.'s Opp'n to Commw. Mot. 8, 23, 24.[26]

On the record before the Court at this stage of litigation, and accepting these pro se allegations as true and construing them liberally, McClintic has stated an RLUIPA claim, and the Commonwealth defendants' motion to dismiss those claims will be denied.[27]

An appropriate order will issue separately.

---

[26]  The Commonwealth defendants do not deny that other drug testing methods were available, and have offered no explanation or argument as to why the urine sample testing policy, as enforced here, was the least restrictive means to test McClintic.

[27]  It remains to be seen whether these allegations can be supported after discovery.  See Holland v. Goord, No. 05-6295, 2013 WL 3148324, at *12 (W.D.N.Y. June 19, 2013) (considering cross-motions for summary judgment, holding that drinking a small amount of water for drug testing was a de minimis burden on prisoner's religious practice of fasting for Ramadan, especially where testimony established that prisoner could have "made up" for the transgression with an extra day of fasting).